1  John P. Kristensen (SBN 224132)
2  **KRISTENSEN LAW GROUP**
3  120 Santa Barbara St., Suite C9
   Santa Barbara, California 93101
4  Telephone: (805) 837-2000
5  *john@kristensen.law*

6  Jarrett L. Ellzey*
7  Texas Bar No. 24040864
   Leigh S. Montgomery*
8  Texas Bar No. 24052214
9  **EKSM, LLP**
   1105 Milford Street
10  Houston, Texas 77006
   Phone: (888) 350-3931
11  *lmontgomery@eksm.com*

12
13  **ATTORNEYS FOR PLAINTIFF AND THE**
   **PUTATIVE CLASS**
14  (* denotes *pro hac vice* forthcoming)

15
           **UNITED STATES DISTRICT COURT**
16         **NORTHERN DISTRICT OF CALIFORNIA**
17               **OAKLAND DIVISION**

18  MARCUS HINES, individually and    ) Case No. 4:25-cv-2571.
19  on behalf of all others similarly  )
   situated,                         )
20                                    ) **CLASS ACTION**
21              Plaintiffs,           ) **COMPLAINT FOR DAMAGES**
         vs.                          )
22                                    )
23  SMART ERP SOLUTIONS, INC.,        ) 1. **Negligence and Negligence Per Se;**
   a California Corporation,          ) 2. **Invasion of Privacy;**
24                                    ) 3. **Breach of Third-Party Beneficiary**
              Defendant.              )    **Contract;**
25                                    ) 4. **Unjust Enrichment;**
                                      ) 5. **Unfair Competition Law; and**
26                                    ) 6. **Violation of Cal. Civ. Code §**
27                                    )    **1798.82**
                                      ) **DEMAND FOR JURY TRIAL**
28

1    Plaintiff Marcus Hines ("Plaintiff" or "Hines"), individually and on behalf

2    of all others similarly situated, brings this Class Action Complaint against Smart

3    ERP Solutions, Inc., ("Defendant" or "Smart ERP") to obtain damages, restitution,

4    and injunctive relief for the Class, as defined below, from Defendant . Plaintiff

5    makes the following allegations upon information and belief, except as to his own

6    actions, the investigation of his counsel, and the facts that are a matter of public

7    record.

8    **I.    NATURE OF THE ACTION**

9    1.    This class action arises out of the recent data security incident and

10    data breach that was perpetrated against Defendant (the "Data Breach"), which

11    held in its possession certain personally identifiable information ("PII"), (the

12    "Private Information") of Plaintiff and other current and former patients of

13    Defendant, the putative class members ("Class"). This Data Breach occurred on or

14    about July 3, 2024 and lasted until July 13, 2024.

15    2.    The Private information compromised in the Data Breach included

16    certain personal information of Defendant Smart ERP's corporate customers'

17    employees. The Private Information exposed to the cybercriminals included

18    Plaintiff's and the Class Members' full name and Social Security number. *See*

19    Plaintiff's Notice at **Exhibit A**.

20    3.    Defendant has reported to the Maine Attorney General's Office that

21    the personal information of 78,713 individuals was exposed to the cyber

22    criminals.[1]

23    4.    The cybercriminals intentionally targeted Smart ERP for the highly

24    sensitive Private Information it stores on its computer network, attacked the

25    insufficiently secured network, then exfiltrated highly sensitive PII, including

26    Social Security numbers. As a result, the Private Information of Plaintiff and Class

27

28    [1] Office of the Maine Attorney General, *available at* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/82ebcfc6-0c29-4a6a-a55a-c7cf89393a6a.html (*last accessed* March 19, 2025).

KRISTENSEN
LAW GROUP
klg

1  Members remains in the hands of those cyber-criminals.

2       5.    The Data Breach resulted from Defendant's failure to implement

3  adequate and reasonable cyber-security procedures and protocols necessary to

4  protect individuals' Private Information with which they were entrusted for either

5  treatment or employment or both.

6       6.    Plaintiff brings this class action lawsuit on behalf of those similarly

7  situated to address Defendant's inadequate safeguarding of Class Members'

8  Private Information that they collected and maintained, and for failing to provide

9  timely and adequate notice to Plaintiff and other Class Members that their

10  information was subjected to unauthorized access by an unknown third party and

11  precisely what specific type of information was accessed.

12       7.    Defendant maintained the Private Information in a reckless manner.

13  In particular, the Private Information was maintained on Defendant's computer

14  network in a condition vulnerable to cyberattacks. Upon information and belief,

15  the mechanism of the Data Breach and potential for improper disclosure of

16  Plaintiff's and Class Members' Private Information was a known risk to

17  Defendant, and thus Defendant was on notice that failing to take steps necessary

18  to secure the Private Information from those risks left that property in a dangerous

19  condition.

20       8.    Defendant, through its employees, disregarded the rights of Plaintiff

21  and Class Members (defined below) by, among other things, intentionally,

22  willfully, recklessly, or negligently failing to take adequate and reasonable

23  measures to ensure its data systems were protected against unauthorized intrusions.

24  Defendant also failed to disclose that it did not have adequately robust computer

25  systems and security practices to safeguard Plaintiff's and Class Members' Private

26  Information and failed to take standard and reasonably available steps to prevent

27  the Data Breach.

28       9.    In addition, Defendant's employees failed to properly monitor the

computer network and systems that housed the Private Information. Had Defendant's employees (presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

10.    Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

11.    Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.    Because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13.    Plaintiff and Class Members may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.    Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15.    Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

16.     Accordingly, Plaintiff sues Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence and negligence *per se*, (ii) invasion of privacy, (iii) breach of implied contract, (iv) unjust enrichment; (v) Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq* ("UCL"); and (vi)Violation of Cal. Civ. Code § 1798.82(a) – California Security Notification Laws).

## II.    PARTIES

17.     Plaintiff Marcus Hines is and at all times mentioned herein was an individual citizen of North Carolina, residing in the city of Rocky Mount.

18.     Defendant Smart ERP Solutions, Inc. is a domestic for-profit stock corporation organized under the laws of California with its principal place of business at 3875 Hopyard Rd. Ste. 180, Pleasanton, California, 94588. Defendant Smart ERP's registered agent, Prema Palanyveloo is located at 3875 Hopyard Rd. Ste. 180, Pleasanton, California, 94588.

## III.    JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

19.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds $5 million, exclusive of interest and costs, there are more than 78 thousand members in the proposed class (with California statutory damages between $100-$750 each), and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

20.     This Court has general personal jurisdiction over Defendant because Defendant is incorporated and has its principal place of business in California.

21.     Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant conducts business in this District and because a substantial part of the acts or omissions giving rise to this action occurred within this District.

22.     Since the acts or omissions which give rise to Plaintiff's claims occurred in the County of Alameda, Pursuant to Local Rule 3.2(c), this action must be assigned to the Oakland division of the Northern District Court.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    DEFENDANT'S BUSINESS

23.    Defendant is a California based cloud computing corporation that specializes in business applications providing end to end solutions for its corporate customer's including housing employee data. [2]

24.    In the ordinary course of providing its business services, clients (like Plaintiff's employer Mclane Inc.) provided and/or entrusted Defendant with the sensitive, personal, and private information of their employees, such as their:

- Name;
- address;
- email address;
- telephone number;
- date of birth; and
- Social Security number.

25.    Defendant agreed to and undertook legal duties to maintain the Private Information entrusted to them by Plaintiff and Class Members, through their employers, safely, confidentially, and in compliance with all applicable laws.[3]

26.    In the ordinary course of providing business application services to its clients, Smart ERP obtained a variety of sensitive, personal and private information regarding its clients' current and former corporate customers employees, including Plaintiff and Class Members.

27.    Upon information and belief, Defendant's Privacy Policy is provided to every corporate customers' employees prior to employee or employer use of their business application software and upon request.

---

[2] https://www.smarterp.com/company/about-us#:~:text=The%20Travel%2C%20Transportation%2C%20and%20Logistics,our%20various%20services%20and%20solutions.

[3] https://www.smartonboarding.com/privacy-statement (last viewed Mar. 18, 2025).

28.     Upon information and belief, in the course of collecting Private Information from its corporate customer's and their employees, Defendant promised to provide confidentiality and adequate security for the data it collected regarding its clients' customers.[4]

29.     Defendant  agreed to and undertook legal duties to maintain the Private Information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws.

30.     A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

31.     On March 11, 2025, Defendant sent out Notice of Security Incident letters to individuals, including Plaintiff, whose data had been exposed in the Data Breach.

32.     The Notice of Security Incident (Exhibit A) stated in part:

> "We are writing with important information regarding a recent cyber security incident that potentially involved unauthorized access to personal data held by Smart ERP Solutions, Inc. … On July 13, 2024, Smart ERP experienced a network security incident that impacted some operations. … After an extensive investigation and manual document review, on February 11, 2025, we discovered that between July 3, 2024 and July 13, 2024, a limited amount of information stored on our network may have been accessed and/or acquired by an unauthorized individual … The impacted information includes the following: Full name and Social Security number…."

33.     Plaintiff's notice letter was dated more than one month after defendant uncovered the Data Breach, but more than eight months after the Data Breach occurred.

[4] *Id.*

34.    Defendant had obligations created by contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

35.    Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

36.    Defendant's data security obligations were particularly important given the substantial increase in Data Breaches preceding the date of the Data Breach.

37.    Defendant was or should have been aware of the significant risk that cybercriminals would attempt to steal Plaintiff's and Class Members' Private Information.

38.    In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[5] Professional Services industry, such as Defendant's industry, experienced 308 data compromises in 2023, which ranked third behind financial services and healthcare services.[6]

39.    Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

40.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

---

[5] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited December 18, 2024).
[6] *Id.*

**B.    DATA BREACHES ARE PREVENTABLE**

41.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of the Private Information, such as encrypting the information or deleting it when it is no longer needed.

42.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

43.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[7]

44.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

---

[7] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[8]

---

[8] *Id.* at 3-4.

45.     To prevent and detect cyber-attacks or ransomware attacks,
Defendant could and should have implemented, as recommended by the
Microsoft Threat Protection Intelligence Team, the following measures:

<u>Secure Internet-Facing Assets</u>

-       Apply latest security updates

-       Use threat and vulnerability management

-       Perform regular audit; remove privileged credentials;

<u>Thoroughly investigate and remediate alerts</u>

-       Prioritize and treat commodity malware infections as potential full
compromise;

<u>Include IT Pros in security discussions</u>

-       Ensure collaboration among security operations, security admins, and
information technology admins to configure servers and other endpoints
securely;

<u>Build credential hygiene</u>

-       Use multifactor authentication or network level authentication and
use strong,
randomized, just-in-time local admin passwords;

<u>Apply principle of least-privilege</u>

-       Monitor for adversarial activities

-       Hunt for brute force attempts

-       Monitor for cleanup of Event Logs

-       Analyze logon events;

<u>Harden infrastructure</u>

-       Use Windows Defender Firewall

-       Enable tamper protection

-       Enable cloud-delivered protection

1    -    Turn on attack surface reduction rules and Antimalware Scan

2    Interface for

3    Office Visual Basic for Applications.[9]

4    46.    Given that Defendant was storing the Private Information of its

5    current and former Corporate customer's employees' Defendant could and should

6    have implemented all of the above measures to prevent and detect cyberattacks.

7    47.    The occurrence of the Data Breach indicates that Defendant failed to

8    adequately implement one or more of the above measures to prevent cyberattacks,

9    resulting in the Data Breach and data thieves acquiring and accessing the Private

10    Information of, upon information and belief, thousands to tens of thousands of

11    individuals, including that of Plaintiff and Class Members.

12    **i.    <u>Defendant Acquires, Collects & Stores Corporate Customers'</u>**

13    **<u>employee's Private Information</u>**

14    48.    Defendant acquires, collects, and stores a massive amount of Private

15    Information on its current and former corporate customer's employees.

16    49.    As a condition of obtaining employment with an employer who has a

17    business relationship from Defendant, Defendant requires that its current and

18    former corporate customer's employees entrust it with highly sensitive personal

19    information.

20    50.    By obtaining, collecting, and using Plaintiff's and Class Members'

21    Private Information, Defendant assumed legal and equitable duties and knew or

22    should have known that it was responsible for protecting Plaintiff's and Class

23    Members' Private Information from disclosure.

24    51.    Plaintiff and the Class Members have taken reasonable steps to

25    maintain the confidentiality of their Private Information and would not have

26    entrusted it to Defendant absent a promise to safeguard that information.

27

28    [9] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

52.    Upon information and belief, in the course of collecting Private Information from corporate customers' employees, including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

53.    Plaintiff and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### ii.    Value of Private Information

54.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

55.    The PII of individuals retains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.

56.    For example, Personal Information can be sold at a price ranging from $40 to $200.  Criminals can also purchase access to entire company data breaches from $900 to $4,500.

57.    Among other forms of fraud, identity thieves may use the stolen Private Information to obtain driver's licenses, government benefits, medical services, housing or even give false information to police.

58.    Due to the nature of fraudulent activity that results from the Data

Breach, such activity may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, as well as between when the Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

59.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**C.     DEFENDANT FAILS TO COMPLY WITH FTC GUIDELINES**

60.     The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

61.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security

problems.[10] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[11]

62.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

63.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

64.    Defendant failed to properly implement basic data security practices.

65.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

66.    Defendant was always fully aware of its obligation to protect the PII of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### D.    DEFENDANT FAILS TO COMPLY WITH INDUSTRY STANDARDS

67.    As shown above, experts studying cyber security routinely identify

---

[10] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited December 18, 2024).
[11] *Id.*

healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

68.    Several best practices have been identified that a minimum should be implemented by professional service providers like Defendant, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

69.    Other best cybersecurity practices that are standard in the professional services industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

70.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

71.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

E.    **DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT**

72.    Data Breaches such as the one experienced by Defendant's patients are especially problematic because of the disruption they cause to the daily lives of

KRISTENSEN
LAW GROUP

victims affected by the attack.

73.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[12]

74.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[13]

75.    Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

76.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

77.    Theft of Private Information is gravely serious. PII is a valuable property right.[14] Its value is axiomatic, considering the value of Big Data in

---

[12] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited December 18, 2024) ("GAO Report").

[13] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited December 18, 2024).

[14] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies

corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

78.     Theft of PHI is also gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[15] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

79.     It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

80.     [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm. *See* GAO Report at p. 29.

---

obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[15] *See* Federal Trade Commission, *Medical Identity Theft*, *available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited December 18, 2024).

81.     Private Information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

82.     There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

83.     Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[16] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

84.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[17] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[18] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

85.     It is also hard to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant

---

[16] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited December 18, 2024).
[17] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited December 18, 2024).
[18] *Id* at 4.

paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

86.    In recent years, professional services industries have experienced higher numbers of data theft events than most other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### F.    PLAINTIFF'S EXPERIENCE

87.    Plaintiff Marcus Hines is and at all times mentioned herein was an individual citizen of North Carolina, residing in the city of Rocky Mount.

88.    Plaintiff was employed by McLane, Inc. which was a corporate customer of Defendant's, and implemented Defendant's software services as part of their resource management strategies. Plaintiff provided his employer and thereby Defendant with his sensitive PII in order to receive employment from McLane, Inc., corporate customer of Defendant. Plaintiff received an email notice of the Data Breach on March 11, 2025.

89.    Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

90.    Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her sensitive online accounts.

---

[19] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited December 18, 2024).

91.    Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

92.    Because of the Data Breach, Defendant has advised Plaintiff to take certain steps to protect his Private Information and otherwise mitigate his damages.

93.    In the time since her Private Information was stolen, Plaintiff has spent time and energy watching her information and accounts and trying to change passwords. However, given the limited information known and the fact that the cyber-attack is ongoing, Plaintiff feels helpless to protect herself from the damages that is already done.

94.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among other things, monitoring her accounts for fraudulent activity.

95.    Even with the best response, the harm caused to Plaintiff cannot be undone.

96.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

97.    Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

98.    Plaintiff has a continuing interest in ensuring that her Private

Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### G. DEFENDANT'S BREACH

99.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect customers' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to train employees in the proper handling of emails, and to maintain adequate email security practices;

e.    Failing to ensure that vendors with access to Defendant's network employed reasonable security procedures;

f.    Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

g.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

h.    Failing to adhere to industry standards for cybersecurity.

100.    As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

101.    Accordingly, as outlined below, Plaintiff and Class Members now face

1    an increased risk of fraud and identity theft.

2    **Because of Defendant's Failure to Safeguard Private Information, Plaintiff**

3    **and the Class Members Have and Will Experience Substantial Harm in the**

4    **Form of Risk of Continued Identity Theft.**

5    102.   Plaintiff and members of the proposed Class have suffered injury from

6    the misuse of their PII that can be directly traced to Defendant.

7    103.   The ramifications of Defendant's failure to keep Plaintiff's and the

8    Class's PII secure are severe. Identity theft occurs when someone uses another's

9    personal information such as that person's name, account number, Social Security

10   number, driver's license number, date of birth, and/or other information, without

11   permission, to commit fraud or other crimes. According to experts, one out of four

12   data breach notification recipients become a victim of identity fraud.

13   104.   Because of Defendant's failures to prevent-and to timely detect-the

14   Data Breach, Plaintiff and the proposed Class have suffered and will continue to

15   suffer damages, including monetary losses, lost time, anxiety, and emotional

16   distress. They have suffered or are at an increased risk of suffering:

17       a.  The loss of the opportunity to control how their PII is used;

18       b.  The diminution in value of their PII;

19       c.  The compromise and continuing publication of their PII;

20       d.  Out-of-pocket costs associated with the prevention, detection, recovery,

21           and remediation from identity theft or fraud;

22       e.  Lost opportunity costs and lost wages associated with the time and effort

23           expended addressing and attempting to mitigate the actual and

24           consequences of the Data Breach, including, but not limited to, efforts

25           spent researching how to prevent, detect, contest, and recover from

26           identity theft and fraud;

27       f.  Delay in receipt of tax refund monies;

28       g.  Unauthorized use of stolen PII; and

KRISTENSEN
LAW GROUP

h. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

105.   Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

106.   The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

107.   It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

108.   One such example of criminals using PII for profit is the development of "Fullz" packages.

109.   Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

110.   The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and

members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

111.   According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

112.   Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

113.   Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

114.   In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

115.   Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

116.   The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable

presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."

117.    The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

    a.  encrypting information stored on computer networks;

    b.  retaining payment card information only as long as necessary;

    c.  properly disposing of personal information that is no longer needed;

    d.  limiting administrative access to business systems;

    e.  using industry-tested and accepted methods for securing data;

    f.  monitoring activity on networks to uncover unapproved activity;

    g.  verifying that privacy and security features function properly;

    h.  testing for common vulnerabilities; and

    i.  updating and patching third-party software.

118.    According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.  The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

119.    Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

120.    Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTIFY THEFT

121. Data Breaches such as the one experienced by Defendant are especially problematic because of the disruption they cause to the daily lives of the Defendant's corporate customer's employees, the true victims affected by the attack.

122. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

123. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

124. Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

125. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

126. Theft of Private Information is gravely serious. PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate

KRISTENSEN
LAW GROUP

America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

127. It must also be noted there may be a substantial time lag-measured in years- between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO Report, at p. 29.

128. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

129. There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

130. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of

1    that information and damage to victims may continue for years.

2        131.    For example, the Social Security Administration has warned that

3    identity thieves can use an individual's Social Security number to apply for more

4    credit lines.  Such fraud may go undetected until debt collection calls commence

5    months, or even years, later. Stolen Social Security Numbers also make it possible

6    for thieves to file fraudulent tax returns, file for unemployment benefits, or apply

7    for a job using a false identity.  Each of these fraudulent activities is difficult to

8    detect. An individual may not know that his or her Social Security Number was

9    used to file for unemployment benefits until law enforcement notifies the individual

10   employer of the suspected fraud. Fraudulent tax returns are typically discovered

11   only when an individual's authentic tax return is rejected.

12       132.    It is also hard to change or cancel a stolen Social Security number.

13       133.    An individual cannot obtain a new Social Security number without

14   significant paperwork and evidence of actual misuse. Even then, a new Social

15   Security number may not be effective, as "[t]he credit bureaus and banks are able

16   to link the new number very quickly to the old number, so all of that old bad

17   information is quickly inherited into the new Social Security number."

18       134.    Defendant therefore knew or should have known this and strengthened

19   its data systems accordingly. Defendant were put on notice of the substantial and

20   foreseeable risk of harm from a data breach, yet it failed to properly prepare for that

21   risk.

22   **V.    PLAINTIFF'S AND CLASS MEMBERS' DAMAGES**

23       135.    To date, Defendant has done little to provide Plaintiff and Class

24   Members with any notice of what information is being held by the cybercriminals

25   so that they could take action to protect themselves. As a result, Plaintiff and the

26   Class Members are at the mercy of the cybercriminals.

27       136.    Plaintiff and Class Members have been damaged by the compromise

28   of their Private Information in the Data Breach, and by the severe disruption to their

lives as a direct and foreseeable consequence of this Data Breach.

137.  Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

138.  Plaintiff was damaged in that his Private Information is in the hands of cyber criminals.

139.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

140.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

141.  Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

142.  Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

143.  Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

144.  Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

145.  Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for

misuse.

146.   Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.   Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b.   Purchasing credit monitoring and identity theft prevention;

c.   Placing "freezes" and "alerts" with reporting agencies;

d.   Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e.   Contacting financial institutions and closing or modifying financial accounts; and; and

f.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

147.   Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

148.   As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VI.   PLAINTIFF'S AND CLASS ACTION ALLEGATIONS

149.   Plaintiffs brings this nationwide class action on behalf of himself and

on behalf of others similarly situated under Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

150.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> **Nationwide Class: All persons whose Private Information was compromised because of the Data Breach that occurred on, or around, July 3, 2024 (the "Class").**

> **California Subclass: All individuals and entities residing or have resided in California whose Private Information was compromised in the Data Breach on, or around, July 3, 2024.**

151.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

152.    Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

153.    Numerosity, Fed R. Civ. P. 23(a)(l): Class Members are numerous that joinder of all of them in a single proceeding is impracticable. The exact number of Class Members is unknown to Plaintiff now, but it is reportedly 17 million or more. *See Supra* Section I.

154.    Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed

Plaintiff's and Class Members' Private Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.    Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.    Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i.    Whether Defendant failed to provide notice of the Data Breach promptly; and

j.    Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

155. <u>Typicality,</u> Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims

and those of Class Members arise from the same operative facts and are based on the same legal theories.

156.  Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged here apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct toward the Class as a whole, not on facts or law applicable only to Plaintiffs.

157.  Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

158.  Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

159.  Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the

fair and efficient adjudication of the controversy alleged here; it will permit many Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

160.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

161.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

162.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### NEGLIGENCE AND NEGLIGENCE *PER SE*

#### (On Behalf of Plaintiff and All Class Members)

163.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

164. Defendant required Plaintiff and Class Members to submit non-public personal information to obtain healthcare services.

165. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

166. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

167. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including, but not limited to, HIPAA, as well as common law. Defendant could ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

168. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all the healthcare information at issue constitutes "protected health information" within the meaning of HIPAA.

169. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

170. Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

171. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

172. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

173. Failing to adequately monitor the security of its networks and systems;

174. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

175. Failing to store sensitive information in an encrypted state;

176. Allowing unauthorized access to Class Members' Private Information;

177. Failing to detect timely that Class Members' Private Information had been compromised;

178. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

179. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

180. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

181. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

182. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

183. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

184. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## SECOND CAUSE OF ACTION

### INVASION OF PRIVACY

### (On Behalf of Plaintiff and All Class Members)

185. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

186. Plaintiff and the Nationwide Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

187. Defendant owed a duty to its current and former clients, including Plaintiff and the Nationwide Class, to keep their PII contained as a part thereof, confidential.

188. Defendant failed to protect and actually or potentially released to unknown and unauthorized third parties the PII of Plaintiff and the Nationwide Class.

189. Defendant allowed unauthorized and unknown third parties to actually or potentially access and examine the PII of Plaintiff and the Nationwide Class, by

way of Defendant's failure to protect the PII. The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and the Nationwide Class is highly offensive to a reasonable person.

190.   The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and the Nationwide Class disclosed their PII to Defendant as part of Plaintiff's and the Nationwide Class's relationships with Defendant, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure.

191.   Plaintiff and the Nationwide Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

192.   The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiff and the Nationwide Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person. Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

193.   Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and the Nationwide Class.

194.   Moreover, as a result of the Data Breach, Plaintiff's Private Information is a private fact as a result of the Data Breach, Defendant publicly disclosed Plaintiff's and Class Members' private facts.

195.   Plaintiff and Class Members' Private Information constitutes a private fact.

196.   As a result of the Data Breach, Defendant publicly disclosed Plaintiff's and Class Members' Private Facts.

197.   Defendant's public disclosure of Plaintiff's and Class Members' Private Facts was offensive and objectionable to the reasonable person and is not of a legitimate public concern.

198.   As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiff and the Nationwide Class was accessed by third parties without authorization, causing Plaintiff and the Nationwide Class to suffer damages.

199.   Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Nationwide Class in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Nationwide Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Nationwide Class.

## THIRD CAUSE OF ACTION

### BREACH OF IMPLIED CONTRACT

### (On Behalf of Plaintiff and All Class Members)

200.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

201.   When Plaintiff and Class Members provided their Private Information to Defendant in exchange for Defendant's services and/or employment, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

202.   Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

203.   In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied

with relevant laws and regulations, including HIPAA, and adhered to industry standards.

204.  Plaintiff and Class Members paid money to Defendant or provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

205.  Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

206.  Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

207.  Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

208.  Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

209.  As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

210.  Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

211.  Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

///

///

# FOURTH CAUSE OF ACTION

## UNJUST ENRICHMENT

## (On Behalf of Plaintiff and All Class Members)

212.   Plaintiff brings this claim individually and on behalf of all Class Members.

213.   This cause of action is brought in the alternative to the Third Cause of Action for Breach of Implied Contract.

214.   Defendant benefited from receiving Plaintiff and Class Members' Private Information by its ability to retain and use that information for its own benefit. Defendant understood this benefit.

215.   Defendant also understood and appreciated that Plaintiff's and Class Members' Private Information was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

216.   Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of providing their Private Information to Defendant. In connection thereto, Plaintiff and Class Members provided Private Information to Defendant with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures. Specifically, Plaintiff and Class Members were required to provide their Private Information. In exchange, Plaintiff and Class Members should have received adequate protection and data security for such Private Information held by Defendant.

217.   Defendant knew Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

218.   Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members.

219.   Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members because

Defendant failed to implement appropriate data management and security measures mandated by industry standards.

220. Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

221. Plaintiff and Class Members have no adequate remedy at law.

222. Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

223. As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## FIFTH CAUSE OF ACTION

### VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ* ("UCL")

### (On Behalf of Plaintiff and All Class Members, or Alternatively, the California Subclass)

224. Defendant is a "person" defined by Cal. Bus. & Prof. Code. §17201.

225. Defendant violated Cal. Bus. & Prof. Code. §17200 et seq. (UCL) by engaging in unlawful, unfair and deceptive acts and practices.

226. Defendant stored Plaintiff and Class Members' Private Information in its electronic and patient information databases. Defendant represented to Plaintiff and Class Members that their Private Information was secure, and that Plaintiff and the Class Members' Private Information would remain private. Defendant engaged in unfair acts and business practices by representing that it had secure computer systems when it did not.

227. Even without these misrepresentations, Plaintiff and the Class Members were entitled to, and did, assume Defendant would take appropriate measures to keep their Private Information safe. Defendant did not disclose at any time that Plaintiff and Class Members' Private Information was vulnerable to

1    hackers because Defendant's data security measures were inadequate and outdated,

2    and Defendant was the only entity in possession of that material information, which

3    it had a duty to disclose.

4        228.   Defendant knew or should have known it did not employ reasonable

5    measures that would have kept Plaintiff and the Class Members' Private

6    Information secure and prevented the loss or misuse of Plaintiff and the Class

7    Members' Private Information.

8        229.   Defendant violated the UCL by misrepresenting, both by affirmative

9    conduct and by omission, the security of its systems and services, and its ability to

10   safely store Plaintiff and the Class Members' Private Information. Defendant also

11   violated the UCL by failing to implement and maintain reasonable security

12   procedures and practices appropriate to protect Private Information, and by failing

13   to immediately notify Plaintiff and the Class Members of the Data Breach.

14       230.   Defendant also violated its commitment to maintain the confidentiality

15   and security of Plaintiff's and the Class Members' Private Information and failed

16   to comply with its own policies and applicable laws, regulations, and industry

17   standards relating to data security.

18       231.   **Defendant engaged in unfair business practices under the**

19   **"balancing test."** The harm caused by Defendant's actions and omissions, as

20   described in detail above, greatly outweigh any perceived utility. Indeed,

21   Defendant's failure to follow basic data security protocols and misrepresentations

22   to Plaintiff and Class Members about Defendant's data security cannot be said to

23   have had any utility at all. All these actions and omissions were clearly injurious to

24   Plaintiff and the Class Members, directly causing the harms alleged below.

25       232.   **Defendant engaged in unfair business practices under the**

26   **"tethering test."** Defendant's actions and omissions, as described in detail above,

27   violated fundamental public policies expressed by the California Legislature. See,

28   e.g., Cal. Civ. Code § 1798.1 ("The Legislature declares that ... all individuals have

a right of privacy in information pertaining to them.... The increasing use of computers ... has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern.") Defendant's acts and omissions, and the injuries caused by them, are thus "comparable to or the same as a violation of the law ..." Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal. 4th 163, 187.

233.    **Defendant engaged in unfair business practices under the "FTC test."** The harm caused by Defendant's actions and omissions, as described in detail above, is substantial in that it affects tens of thousands of Class Members and has caused those persons to suffer actual harms. Such harms include a substantial risk of identity theft, disclosure of Plaintiff's and the Class Members' Private Information to third parties without their consent, diminution in value of their Customer Data, consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures. This harm continues given the fact that Plaintiffs' and the Class Members' Private Information remains in Defendant's possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendant's actions and omissions violated, inter alia, Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45. *See, e.g., F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 613 (D.N.J. 2014), *aff'd*, 799 F.3d 236 (3d Cir. 2015); *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act); *In re BJ's Wholesale Club, Inc.*, -4148, FTC File No. 042-3160 (Sept. 20, 2005)

1   (same); *In re CardSystems Solutions, Inc.*, FTC Docket No. C-4168, FTC File No.

2   052-3148 (Sept. 5, 2006) (same); *see also United States v. ChoicePoint, Inc.*, Civil

3   Action No. 1:06-cv-0198-JTC (N.D. Ga. Oct. 14, 2009) ("failure to establish and

4   implement, and thereafter maintain, a comprehensive information security program

5   that is reasonably designed to protect the security. confidentiality, and integrity of

6   personal information collected from or about consumers" violates § 5(a) of FTC

7   Act); 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ]

8   or[are] likely to cause substantial injury to consumers which [are] not reasonably

9   avoidable by consumers themselves and not outweighed by countervailing benefits

10  to consumers or to competition.").

11      234.   Plaintiff and the Class Members suffered injury in fact and lost money

12  or property as the result of Defendant's unfair business practices. In particular,

13  Plaintiff and the Class Members have suffered from their protected health

14  information being leaked on the dark web to unauthorized persons, including cyber

15  criminals; and other similar harm, all as a result of the Data Breach. In addition,

16  their Private Information was taken and is in the hands of those who will use it for

17  their own advantage, or is being sold for value, making it clear that the hacked

18  information is of tangible value. Plaintiff and the Class Members have also suffered

19  consequential out of pocket losses for procuring credit freeze or protection services,

20  identity theft monitoring, and other expenses relating to identity theft losses or

21  protective measures.

22      235.   Defendant's 'unfair' acts and practices further include:

23      •   Utilizing cheaper, ineffective security measures and diverting those

24          funds to its own profit, instead of providing a reasonable level of

25          security that would have preventing the hacking incident;

26      •   Failing to follow industry standard and the applicable, required and

27          appropriate protocols, policies and/or procedures regarding the

28          encryption of data;

- Failing to timely and adequately notify Class Members about the Data Breach and the scope of same, so that Class Members could take appropriate steps to mitigate the potential for identity theft and other damages;

- Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

- Omitting, suppressing and concealing the material fact that Defendant did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII.

236. Defendant has engaged in 'unlawful' business practices by violating multiple laws, including the FTC Act, 15 U.S.C. §45, Gramm-Leach-Biley Act ("GLBA"), Cal. *Civ. Code* § 1798.82, and California common law.

237. Defendant's unlawful acts and practices include:

- Failing to implement and maintain reasonable security and privacy measures to protect it's customers PII, which was a direct and proximate cause of the Data Breach;

- Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

- Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act 15 U.S.C. §45 and GLBA, which was a direct and proximate cause of the Data Breach;

- Failing to comply with Cal. *Civ. Code* § 1798.82;

- Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' personal information, including by implementing and maintaining reasonable security measures; and

- Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, Cal. *Civ. Code* § 1798.82; 15 U.S.C. §45 and GLBA.

238. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal information.

239. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and Class Members' were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their personal information.

240. Defendant's violations were, and are, willful, deceptive, unfair and unconscionable.

241. Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for financial services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the Private Information, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

242. Plaintiff and Class Members have lost money and property as a result

of Defendant's conduct in violation of the UCL, as stated herein and above.

243.    By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property from Plaintiff and Class Members.

244.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

245.    Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under Cal. *Code of Civ. Proc.* § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## SIXTH CAUSE OF ACTION

### VIOLATION OF CAL. CIV. CODE § 1798.82(A) –

### CALIFORNIA SECURITY NOTIFICATION LAWS)

### (On Behalf of Plaintiff and All Class Members, or Alternatively, the

### California Subclass)

246.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

247.    Pursuant to Cal. *Civ. Code* § 1798.82(a), "A person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose a breach of the security of the system following discovery or notification of the breach in the security of the data to a resident of California (1) whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person, or, (2) whose encrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person and the encryption key or security credential

was, or is reasonably believed to have been, acquired by an unauthorized person and the person or business that owns or licenses the encrypted information has a reasonable belief that the encryption key or security credential could render that personal information readable or usable. The disclosure shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subdivision (c), or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system." Prior to passage of such statute, the California State Assembly cited an incident where authorities knew of the breach in security for 21 days "before state workers were told" as an example of "late notice."

248. Cal. *Civ. Code* § 1798.82 further provides, "(h) For purposes of this section, 'personal information' means an individual's first name or first initial and last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted: (1) Social security number. (2) Driver's license number or California Identification Card number. (3) Account number, credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account. (4) Medical information. (5) Health insurance information. (i) .... (2) For purposes of this section.

249. Defendant conducts business in California and owns or licenses computerized data which includes the personal information, within the meaning of Cal. *Civ. Code* § § 1798.82(h), of Plaintiff and the Class.

250. Based upon Defendant's Notice of Data Incident Letter, Defendant was aware that Plaintiff and the Class Members unencrypted personal information was, or is reasonably believed to have been acquired by an unauthorized person no later than April 12, 2024, but did not begin to mail notification letters to Plaintiff and the Class until May 31, 2024. Thus, Defendant waited at least 49 days before *beginning* to inform Plaintiff and the Class of this incident and the

subsequent threat to Plaintiff and the Class Members unencrypted personal information. As a result, Defendant did not disclose to Plaintiff and the Class Members that their unencrypted personal information was, or was reasonably believed to have been, acquired by an unauthorized person, in the most expedient time possible and without reasonable delay in violation of Cal. *Civ. Code* § 1798.82(a). Given the example of the Legislature finding that a delay of 21 days to be "late notice" under the statute, Defendant's delay of 49 days before *beginning* to inform Plaintiff and Class Members that their personal information was, or was reasonably believed to have been, acquired by an unauthorized person by mailing Defendant's Notice of Data Security Incident Letter to Plaintiff and Class Members is a presumptively unreasonable notice in violation of Cal. *Civ. Code* § 1798.82(a).

251.   Upon information and belief, Plaintiff believes and alleges that no law enforcement agency has notified Defendants that the notification would impede a criminal investigation justifying Defendant's decision to wait 49 days *before beginning to mail* notification letters to Plaintiff and Class Members *after* they knew that Plaintiff and Class Members unencrypted personal information on Defendant's network server was, or was reasonably believed to have been acquired by an unauthorized person. Upon information and belief, Plaintiff believes and alleges that there were no measures taken by Defendant to determine the scope of the breach or to restore the reasonable integrity of the data system, which justifies Defendant's decision to wait 49 days *before beginning to mail* notification letters to Plaintiff and Class Members. Moreover, FI9's Notice of Data Security Incident Letter mailed to Plaintiff and Class *failed* to state whether notification was delayed as a result of a law enforcement investigation, in violation of Cal. *Civ. Code* § 1798.82(d)(2)(D).

252.   Plaintiff and Class Members have been injured by fact that Defendants did not disclose to them that their unencrypted personal information was, or was reasonably believed to have been, acquired by an unauthorized person in the most

expedient time possible and without reasonable delay in violation of Cal. *Civ. Code* § 1798.82(a). Defendant's delays in informing required by Cal. *Civ. Code* § 1798.82(a) and providing all of the information required by Cal. *Civ. Code* § 1798.82(d) to Plaintiff and Class Members that their unencrypted personal information was, or was reasonably believed to have been, acquired by an unauthorized person, have prevented Plaintiff and Class Members from taking steps in the most expedient time possible to protect their unencrypted personal information from unauthorized use and/or identify theft.

253. As a direct and proximate result of Defendant's and/or its employees' above -described conduct in violation of Cal. *Civ. Code* § § 1798.82(a), Plaintiff and Class Members seek damages suffered, according to proof, pursuant to Cal. *Civ. Code* § 1798.84(b), and injunctive relief pursuant to Cal. *Civ. Code* § 1798.84(e), from the Defendant.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff on behalf of herself and the Class described above seeks the following relief:

1. For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

2. For special damages according to proof;

3. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

4. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

5. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

6. For an Order directing Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

7. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

8. For an award of punitive damages, as allowable by law;

9. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

10. Pre-judgment and post-judgment interest on any amounts awarded; and

11. Any other relief that this court may deem just and proper.

Dated: March 22, 2025

**KRISTENSEN LAW GROUP & EKSM, LLP**

*/s/ John P. Kristensen*

John P. Kristensen
Jarrett L. Ellzey
Leigh S. Montgomery

***Attorneys for Plaintiff and the Putative Class***

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all such triable claims.

Dated: March 22, 2025

**KRISTENSEN LAW GROUP & EKSM, LLP**

*/s/ John P. Kristensen*

John P. Kristensen
Jarrett L. Ellzey
Leigh S. Montgomery

***Attorneys for Plaintiff and the Putative Class***



*Important Information*
*Please Review Carefully*

 **SMART ERP**
*Solutions*

# EXHIBIT
# A

March 11, 2025

23 1 5264 ****************AUTO**5-DIGIT 27601
**MARCUS HINES**



Dear Marcus Hines:

We are writing with important information regarding a recent cyber security incident that potentially involved unauthorized access to personal data held by Smart ERP Solutions, Inc. ("SmartERP"). Specifically, we wanted to provide you with information about the incident, tell you about the services that we are providing you, and assure you that we are continuing to take significant measures to protect the personal information entrusted to us by Mclane Co, Inc.

### What Happened?

On July 13, 2024, Smart ERP experienced a network security incident that impacted some operations.

### What We Are Doing.

Upon learning of this issue, we immediately commenced a prompt and thorough investigation working very closely with external cybersecurity professionals experienced in handling these types of incidents to determine whether there was any unauthorized access to protected information. After an extensive investigation and manual document review, on February 11, 2025, we discovered that between July 3, 2024 and July 13, 2024, a limited amount of information stored on our network may have been accessed and/or acquired by an unauthorized individual.

### What Information Was Involved?

The impacted information includes the following: full name and Social Security number.

### What You Can Do

**We have no evidence that any of your information has been misused as a direct result of this incident.** Nevertheless, out of an abundance of caution we want to make you aware of the incident. We are offering a complimentary 12 month membership of Experian IdentityWorks℠ Credit 3B. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on immediate identification and resolution of identity theft. IdentityWorks Credit 3B is completely free to you and enrolling in this program will not hurt your credit score. For more information on identity theft prevention and IdentityWorks Credit 3B, including instructions on how to activate your complimentary 12 month membership, please see the additional information provided in this letter.

This letter also provides other precautionary measures you can take to protect your personal information, including placing a fraud alert and/or security freeze on your credit files, and/or obtaining a free credit report. Additionally, you should always remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis.

ELN-23654-520